Filed 10/5/20  P. v. Leon CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>TONY DAVID LEON,<br><br>     Defendant and Appellant. | F077831<br><br>(Fresno Super. Ct. No. F12905804)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  James Petrucelli, Judge.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Tony David Leon was convicted by jury trial of second degree murder and assault with a deadly weapon. On appeal, he contends the trial court erred in (1) excluding defense ballistics expert testimony that would have supported a potential defense that he believed the shotgun he fired contained birdshot and would not be lethal, and (2) allowing witnesses to identify defendant by his nickname, "Gangster." We affirm.

## PROCEDURAL SUMMARY

On April 3, 2018, the Fresno County District Attorney filed a second amended information charging defendant with the murder of Nicole Jones (Pen. Code, § 187, subd. (a);[1] count 1), attempted murder (§§ 664, 187, subd. (a); count 2), and assault with a deadly weapon (§ 245, subd. (a); count 3). As to each count, the information also alleged that defendant personally used a firearm in the commission of the crime (§ 12022.5, subd. (a)). As to counts 1 and 2, the information alleged defendant personally and intentionally discharged a firearm in the commission of the crimes causing great bodily injury or death (§ 12022.53, subd. (d)). As to counts 2 and 3, the information alleged defendant personally inflicted great bodily injury in the commission of the crimes (§ 12022.7, subd. (a)). The information further alleged defendant had suffered a prior felony "strike" conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) and had served two prior prison terms (§ 667.5, subd. (b)).

The jury trial commenced on April 17, 2018. The jury was instructed and began its deliberations on May 1, 2018. On May 3, 2018, the trial court granted the prosecutor's motion to dismiss count 2, the attempted murder charge. The instructions

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

2

and verdict forms were modified to reflect the dismissal and the court reinstructed the jury on the remaining counts and special allegations.

On May 8, 2018, the jury found defendant not guilty of first degree murder but guilty of second degree murder on count 1, and guilty of assault with a deadly weapon on count 3. As to count 1, the jury also found true the special allegations that defendant personally and intentionally discharged a firearm causing great bodily injury or death and personally used a firearm. As to count 3, the jury found true the special allegations that defendant personally inflicted great bodily injury and personally used a firearm. On the same date, defendant admitted having suffered a prior serious felony conviction and having served two prior prison terms.

On June 28, 2018, the trial court sentenced defendant to a total of 79 years four months to life in prison as follows: on count 1, 30 years to life (15 years to life, doubled pursuant to the Three Strikes law), plus a 25-year-to-life enhancement for personal and intentional discharge of a firearm causing great bodily injury or death, plus two one-year prior prison term enhancements, for a total of 57 years; on count 3, eight years (four years, doubled pursuant to the Three Strikes law), plus a three-year enhancement for personal infliction of great bodily injury, and a 10-year enhancement for personal use of a firearm, for a total of 21 years, to be served consecutively to the term in count 1; and in two unrelated cases, 16 months, to be served consecutively to the term in count 1.

Defendant filed a notice of appeal on July 19, 2018.

## FACTUAL SUMMARY

**The Prosecution's Case**

### *The "Sucker Punch"*

In July and August of 2012,[2] Noemi and her husband, Luis, lived with Noemi's children, Estefania, Mickey, Omar, Celeste, and Isabel, in a house near Fresno City College. Noemi's nephew, Erik, also lived in the house.

In mid-July, Erik and his girlfriend, Jaelyn, encountered defendant – whom Erik knew only as "Gangster" – and defendant's girlfriend, Vivian. Defendant and Vivian were arguing. Jaelyn asked defendant what was going on. Defendant told Jaelyn to "mind her [own] business." Erik then told defendant that he brought "[his] stuff out [there]" and he should "take it indoors." Defendant appeared to be leaving, but he turned around and "sucker punched" Erik on the right side of his face and then left.

### *The Liquor Store Argument*

About two weeks later, on August 1, at around 7:00 p.m., Erik encountered defendant at a liquor store about a block away from Noemi's house. They argued about the mid-July incident where defendant had sucker punched Erik on the face. Erik told defendant he wanted to finish the fight they had started two weeks earlier. When Erik left the liquor store, he understood that he and defendant would fight at some point in the future. They did not discuss where or when the fight would take place.

Erik went to Noemi's house and told Mickey, Estefania, and their friend, Nicole, what had happened. Luis, Noemi, and Noemi's son-in-law, Humberto, were also in the house and heard Erik's story. According to Erik, after he told the story, he used the restroom and when he came out, Mickey, Estefania, and Nicole had all left the house.[3]

---

[2] All further dates refer to the year 2012 unless otherwise stated.

[3] Mickey, however, testified that Erik did not stay in the house while she, Estefania, and Nicole left. Instead, Mickey testified that after Erik told them about the confrontation with defendant, Erik left in a truck with Humberto and a man named

4

## The Shooting

Mickey's group walked to the street corner near Noemi's house, turned left, and walked toward Fresno City College. As they approached the next intersection, they saw defendant, Vivian, and at least one other man at the street corner. Mickey's group walked toward defendant's group. Mickey and Vivian began a fist fight almost immediately as they came into contact. As Mickey and Vivian fought, defendant joined the fight, kicking Mickey and punching her on the face. Estefania then joined the fight to help Mickey by hitting defendant. When Estefania joined the fight, a man who was with defendant and Vivian also joined the fight. Then a woman who lived in the neighborhood also got involved to try to pull defendant and the man off of Mickey.

Luis was at the street corner near Noemi's house when he learned that Mickey was involved in a fight. He ran back to the house and told Noemi, Erik, and Humberto that Mickey was being "jumped." Noemi, Erik, Humberto, and Luis all ran to the fight, where roughly 20 other people had gathered. Erik arrived as the fight was concluding. He saw that Mickey and Estefania were being hit by defendant, Vivian, and another man. Defendant was holding Mickey by the hair and hitting her. As Erik approached and others began to gather, defendant released Mickey. Mickey and Estefania heard defendant say he was going to get a gun. A 911 caller who lived in an apartment nearby also reported a male shouting, "[G]et my gun, get my gun." Defendant then ran into an apartment. A "minute or two" later, he exited the apartment with a sawed-off shotgun.

Erik testified that as defendant emerged with the shotgun, Erik had not yet reached Mickey and Estefania. At that point, Luis, Mickey, and possibly others shouted that defendant had a gun and multiple people, including Mickey and Estefania, began running

Johnathan to confront defendant at the liquor store. Mickey testified she then left the house with Estefania, Nicole, and another friend because Mickey was concerned that Erik had gone to confront defendant. Mickey knew defendant and Vivian, and she knew that defendant had punched Erik about two weeks earlier.

5

away from defendant. Erik was unarmed but continued to approach defendant, who was standing in the middle of the street near the next intersection. Erik testified that when he was between 37 and 150 feet[4] away from defendant, he told defendant to "put the gun down and fight [him] like a man." Erik testified that defendant "call[ed] [him] a p***y," pointed the shotgun "straight towards" him, holding it level at chest height, and then fired the shotgun once.

Noemi, Estefania, and Nicole were all behind Erik, moving away from defendant, when defendant fired the shotgun. Noemi was walking home and was no more than five steps from reaching the street corner near her house. Nicole was near the same street corner as Noemi. In measurements taken by law enforcement after the shooting, based on statements by Erik, Luis, Estefania, and Mickey, defendant may have been as close as roughly 275 feet from the victims when he fired. And based on defense measurements, defendant may have been as far as about 353 feet from the victims when he fired. Nicole and Noemi were each shot with one double-aught buckshot pellet. Nicole was shot in her left eye and the pellet lodged in the rear of her brain. Noemi was shot in the back and the pellet lodged in the front of her neck.

An ambulance arrived at approximately 7:45 p.m., less than five minutes after the shooting. A second ambulance arrived three minutes later. When the first ambulance arrived, Nicole and Noemi were both lying in the street. Noemi was conscious; Nicole was not. Both were transported to the hospital. Nicole died as a result of her injury. Noemi received a blood transfusion and underwent surgery. The doctors inserted a chest

---

[4] On direct examination, Erik said he was approximately 37 feet (the distance from the witness box to the exterior doors of the courtroom) from defendant when he fired the shotgun. On cross-examination, Erik acknowledged that he might have been as far as 150 feet away from defendant when defendant fired the shotgun. The defense investigator later testified the distance between the approximate location where Erik said he stood and the street corner near where defendant fired the shotgun measured 97 feet.

tube to drain blood and air from her chest.  They then surgically removed the pellet from her neck.

### *The Apprehension and Shotgun Recovery*

At 7:38 p.m., Fresno Police Officers Zarasua and Voelkel responded to a broadcast call for officers to respond to the shooting.  As they approached the scene, they heard other officers broadcasting details regarding the suspect's description.  The suspect was a Hispanic male wearing a white shirt and black pants whose hair was in braids or ponytails.

Less than an hour earlier, at 6:54 p.m., Officers Zarasua and Voelkel had contacted defendant and Vivian as they walked down an alley about one block from where Noemi and Nicole were later shot.  Zarasua and Voelkel had contacted defendant as a matter of routine because they knew he was on probation.  At that time, defendant was wearing a white shirt, dark colored pants, and a hat.  Later, when they heard a description of the shooting suspect and realized it matched defendant's appearance earlier that day, they believed defendant might have committed the shooting.

At 8:05 p.m., Officers Zarasua and Voelkel detained defendant and a man named Joshua as they walked out of an alley near the location of the earlier contact.  Officers then held an infield identification.  Erik, Luis, Estefania, and Mickey each viewed four suspects and identified defendant as the shooter.

After Officers Zarasua and Voelkel took defendant into custody, Fresno Police Sergeants Reynolds and Zavala walked through the alley from which defendant had emerged.  They were approached by a neighbor who was holding a sawed-off shotgun. Reynolds took custody of the shotgun.  The neighbor testified that she had lived in the neighborhood for many years.  That evening, she was outside talking to another neighbor when she was approached by Joshua, a young man who lived in the neighborhood. Joshua asked to talk to her and she agreed.  She walked into her house, but he did not

7

immediately follow.  Instead, he went to her back yard, bent over near her shed where there was a hole in the fence, and hid a sawed-off shotgun.  He then walked next door and returned with defendant, whom the neighbor knew as "Gangster."  Both men came into the neighbor's house and sat down.  Defendant was sweating and appeared "a little bit fidgety."  She told them both to leave and they left.  After defendant and Joshua left, she retrieved the shotgun and took it to Reynolds.

Officers also recovered an expended 12-gauge shotgun shell from a dumpster in the alley where the shotgun was recovered.  The exterior of the recovered shell was marked "[S]uper X."  The shell also bore a "head stamp around the primer of the shot shell" that read "Winchester 12-gauge or 12 GA."  Before the recovered shell was fired, it contained "double[-a]ught buckshot."  When officers searched the apartment where defendant obtained the shotgun, they found the same Winchester brand "Super X" double-aught 12-gauge buckshot shotgun shells and also other shotgun shells, stamped "AAHS 12GA."[5]

### Ballistics Expert Testimony

Nancy McCombs, a senior criminalist with the Department of Justice, worked in the "firearms intel marks unit."  In that role, she had completed a two-year firearms training program and received ongoing training.  She had served as an expert in over 130 firearm-related cases.  The trial court in this case designated McCombs an expert in firearms examination.

McCombs testified that shotgun shells can be filled with different sizes of shot pellets, ranging from BB-sized pellets to triple-aught pellets.  The smaller the pellet size, the more pellets can fit in the shell.  She explained that shotguns vary in bore (i.e., the interior of the barrel) diameter.  Of the common shotgun gauges, 20-gauge is the

---

[5] No testimony was presented to the jury regarding the size or type of the shot in the AAHS 12GA shells.

smallest, then 16-gauge, 12-gauge, and 10-gauge.  She further explained that shotguns are ordinarily not rifled – that is, they have no spiral threading on the interior of the barrel as would normally be found in a rifle to help the bullet fly straighter.  The spread of pellets fired from a shotgun depends on several variables:  the distance of the target from the shotgun, whether the shotgun is affixed with a choke, and the adjustment of any affixed choke.  The length of a shotgun's barrel is irrelevant to pellet spread.

McCombs testified that the shotgun recovered in this case had an overall length of 19 3/8 inches and a barrel length of 12 1/4 inches.  The shotgun appeared to be modified since its barrel length was shorter than commercially available and the stock was visibly shortened.  McCombs described the shotgun as a "single shot" "sawed-off shotgun."  The shotgun did not have a choke.  McCombs compared the recovered spent shell to three test shells that she fired through the shotgun.  She noted the similarity in the breech marks (the marking caused when a shotgun is fired, and the shell hits the breach end of the shotgun) between the test shells and the recovered spent shell.  Based on the agreement of the test shells and the recovered shell, McCombs opined that the recovered spent shell was fired by the shotgun.

McCombs further testified that birdshot contains pellets that are smaller in diameter than buckshot.  The travel distances for birdshot and buckshot depend on "environmental factors."  At gun firing ranges, a minimum of 300 yards is required for shooting birdshot; thus, McCombs believed birdshot could be fatal at 300 feet.  She expected buckshot to travel between 300 and 600 yards.[6]

---

[6] Defendant's proffered expert, George Luczy, did not testify before the jury. However, in an evidentiary hearing, he testified that buckshot had a maximum range of 610 yards and could be fatal out to its maximum range.  Birdshot of the type he believed to have been recovered in this case, on the other hand had a maximum range of only 240 yards and would not be fatal at its maximum range.

**The Defense Case**

Defendant testified that he fired the shotgun into the air because a group of people were coming toward him, and he was scared of the people. He did not aim the shotgun at any person or point it in the direction of either of the victims. He explained that the weapon was not his, but he refused to disclose to whom the weapon belonged. He testified that he was surprised at how far the pellets went. Defense counsel asked him what he thought was in the shotgun when he received it. He testified he did "not know what was in there."

On cross-examination defendant testified that Vivian was his girlfriend, and they had spent most of the day together on August 1. When Vivian and Mickey got into a fight, defendant did not know Mickey, Estefania, Noemi, or Luis, but he had seen them around the neighborhood. He also did not know Erik, but he did punch him on the face about a week before the shooting "[b]ecause he was in [defendant's] business."

Before the shooting on August 1, a car full of people approached defendant and challenged him to a fight. Defendant agreed to fight Erik at Noemi's house. Later that day, Vivian and Mickey got into a fight. Defendant admitted that when he was interviewed by police, he lied, denying the occurrence of all of those incidents.

Defendant testified that he got involved in the fight between Vivian and Mickey only to try to break it up. He did not hit Mickey and he never said he was going to get a gun. It was during the fight that he learned for the first time there was a gun in a nearby apartment. After the fight, he walked to the apartment. He went into the apartment with two other people, whom he refused to identify. He was in the apartment for only a matter of seconds to retrieve the gun. He did not know where the gun was, but one of the two other people retrieved it when he asked for it. Defendant acknowledged he was safe in the apartment.

10

Defendant admitted that when he walked back to where the fight had taken place, he knew the shotgun was loaded. He had seen it being loaded before he took it. He did not see anyone running or hear anyone yelling as he came toward the group with the shotgun. He did not recall Erik telling him to put the gun down and fight him like a man. Defendant did not say anything prior to firing the shotgun. When he pulled the trigger, he believed the shotgun was going to fire. He understood then that guns, and shotguns in particular, are dangerous to human life. After the shooting, he ran back to the apartment complex from which he had gotten the shotgun and discarded the spent shell in a dumpster. He could hear a lot of sirens. He then gave Joshua the shotgun while they were outside of the apartments. Defendant handed the shotgun to Joshua, but he did not know what Joshua would do with it. Defendant admitted he threw away the spent shell and gave the shotgun to Joshua because he wanted to distance himself from any evidence of the shooting.

## DISCUSSION

### I.      Exclusion of Expert Witness Testimony

At the start of trial, defendant indicated that he intended to call George Luczy, a former Los Angeles police officer trained in forensic firearms examination, as a ballistics expert. Defense counsel said the basis for calling Luczy was "just for him to give us some distances of how far the pellets would fly from different shells." After hearing Luczy testify at an Evidence Code section 402 hearing, the trial court concluded Luczy was qualified to testify regarding shotguns and how far pellets would travel, but not the distance at which certain shotgun pellets would cause injury or death. Defendant ultimately did not call Luczy to testify before the jury.

Defendant contends the trial court erred in finding Luczy unqualified to testify to the differences in birdshot and buckshot as they relate to the ability to cause injury and

11

death.  Defendant maintains that Luczy's testimony would have supported his additional defense that he "subjectively lacked malice and fired without an intent to kill."

The People respond that (1) the trial court correctly concluded Luczy lacked the "necessary medical qualifications" to testify to wound causation and cause of death, (2) the expert testimony was not relevant to any contested issue because defendant admitted he did not know what the shotgun was loaded with when he fired it, and (3) the expert testimony would not have been helpful to the jury because the relevant question on the issue of malice was whether a reasonable person would have perceived the risk in firing the shotgun in the way defendant did.

We agree with the People that Luczy's testimony was not relevant to a disputed fact of consequence.[7]

### A.    *Additional Background*

Luczy gave the following testimony at the Evidence Code section 402 hearing outside the presence of the jury.

Luczy testified he was a retired police officer who had worked for 20 years, eight of which he had spent as a ballistics expert.  He had qualified as a ballistics expert 104 times.  In this case, he reviewed photos of the recovered shotgun shells and determined that they were of two types – "nine pellet double[-a]ught buckshot shell[s]" and "low base shotgun shells with birdshot size number eight."  He opined that a double-aught load has pellets that weigh as much as a .32- or .33-caliber bullet (55 grains or 55/7000 of a pound) and has a range of 610 yards.  Double-aught buckshot would be fatal out to its maximum range of 610 yards because the pellets have mass.  Birdshot, on the other hand, is much lighter (only one grain or 1/7000 of a pound) and has a maximum range of only 240 yards.  Luczy opined that at "close distance[, number eight birdshot

---

[7] For this reason, we need not address the issue of Luczy's qualification as an expert.

would be] devastating and fatal," but at its maximum range of 240 yards, it would no longer be lethal. However, he was unable to form an opinion on the minimum distance at which birdshot would no longer be fatal. Instead, he testified that "as the distance increases, … it becomes less fatal because the individual pellets lack mass."

The prosecutor asked Luczy questions regarding the basis for his opinion. Luczy testified that he had previously conducted tests with ballistic gelatin, but he acknowledged he had conducted no experiments regarding this case. Luczy had trained five times in wound ballistics under Dr. Martin Fackler, whom he described as the "foremost authority in the world on that subject." Luczy's studies included examining the effects of different types of projectiles. Further, as a police firearms examiner, he had conducted "distance determination test[s]" to estimate the distance between the muzzle of a firearm and a victim.

Luczy had no training in the "areas of cause and manner of death." With respect to medical experience, he had worked as an inhalation therapist and an orderly in the mid- to late-1960's. He had no medical experience regarding when a projectile would be fatal at a given distance. However, he had observed "hundreds" of autopsies and investigated 55 officer-involved shootings.

After hearing this testimony, the trial court stated it believed Luczy was unqualified to testify regarding the distance at which certain shotgun loads would break the skin, cause injury, or cause death. Defense counsel explained: "Your Honor, I intended to offer this witness from his expertise in dealing with shells, grains of shells, the difference between bird shot and buckshot. It was not my intention to have him qualify as a forensics expert on medical causes of death only as to what he believed where the grain could be – enter the skin versus striking the skin."

The prosecutor moved to exclude some of the evidence, as follows: "[The] People would move to preclude the defense expert from testifying to anything related to

13

projectiles impacting the human body, whether or not those projectiles could enter the human body, break the skin, or cause any sort of injury. [¶] We would further move to preclude[] the expert from testifying as to anything related to injury to the human body, and whether or not a projectile can be fatal at a certain distance, whether or not it could cause injury at a certain distance." The court granted the motion and ruled Luczy could not testify to the distance at which "pellets enter[] the skin, or anything fatal, or even causing injury …." The court found him qualified to testify regarding the "forensic nature of shotgun shells, of the shotgun, of the distances that certain loads would go," "characteristics of certain types of shells, … [and] the amount of pellets in the shells."

Defense counsel did not call Luczy to testify at trial.

### B.    *Relevance of the Excluded Expert Testimony*

Only relevant evidence is admissible. (Evid. Code, § 350.) " 'Relevant evidence' " is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) But expert testimony, even when relevant, is limited to an opinion that is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).)

A trial court's determinations on admissibility of expert testimony are subject to review under the deferential abuse of discretion standard. (*People v. Lucas* (2014) 60 Cal.4th 153, 226, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.)

Here, defendant's subjective intent was relevant to both the express malice component of first degree murder – the specific intent to kill – and the implied malice component of second degree murder – the conscious disregard for life.[8] (*People v. Butler*

---

[8] The jury was instructed on first degree murder (premeditated murder with malice), two theories of second degree murder (unpremeditated murder with express

14

(2010) 187 Cal.App.4th 998, 1006 (*Butler*), citing *People v. Rios* (2000) 23 Cal.4th 450, 460.) A defendant exhibits express malice when he "manifest[s] a deliberate intention to unlawfully" kill another person. (§ 188, subd. (a)(1).) A defendant exhibits implied malice when he " ' "knows that his conduct endangers the life of another and [nonetheless] acts [deliberately] with … conscious disregard for life." [Citation.]' [Citation.]" (*People v. Chun* (2009) 45 Cal.4th 1172, 1181, fn. omitted; accord *People v. Watson* (1981) 30 Cal.3d 290, 296 [conscious indifference for purposes of implied malice murder "contemplates a subjective awareness" of a high degree of risk to life]; see § 188, subd. (a)(2).)

Accordingly, what defendant subjectively believed would happen when he fired the shotgun was relevant to a defense that he fired the shotgun without express or implied malice. And thus, Luczy's testimony would have been relevant if it provided evidence of defendant's subjective intent in shooting the shotgun – for example, if it showed he believed his conduct would not endanger the life of another. According to his proffered testimony, Luczy would have testified that birdshot would be lethal at close range, but not lethal at 240 yards, and its lethality would decrease progressively within that range. Defendant argues that "if [he] believed that he had been handed a gun loaded with birdshot, [his] decision to fire could have been done without implied malice, i.e., without a subjective conscious disregard for human life, because … the [victims] were far away and [he] thought the ammunition was birdshot." The flaw in this argument is that defendant testified that he *did not know* what was in the shotgun—and he did not testify that he thought it contained birdshot. If he did not think the shotgun contained birdshot, he could not have considered the potential lethality of birdshot at the distance from which

---

malice and unpremeditated murder with implied malice), and voluntary manslaughter based on imperfect self-defense.

15

he was shooting. As a result, Luczy's testimony regarding the potential lethality of birdshot was not relevant to defendant's subjective intent when he fired the shotgun.

Defendant responds that "no one asked [him] what he believed was in the gun." Defendant is mistaken. On direct examination, the following exchange took place between defense counsel and defendant:

"[DEFENSE COUNSEL]: Were you shocked or surprised about how far the pellets went?

"[DEFENDANT]: Well, yes.

"[DEFENSE COUNSEL]: What did you think was in the shotgun when you received it?

"[DEFENDANT]: I don't know what was in the shotgun.

"[DEFENSE COUNSEL]: Pardon me?

"[DEFENDANT]: I don't know what was in there.

"[DEFENSE COUNSEL]: You don't know what was in the shotgun?

"[DEFENDANT]: No, I don't."

Thus, defendant was directly asked what he thought was in the shotgun when he received it, and he *did not* state or even suggest that he thought the shotgun contained birdshot. He stated he did not know what it contained, the shotgun was not his, he had never seen the shotgun before he retrieved it from the apartment that day, and he learned about its existence for the first time during the fight between Vivian and Mickey. He did not testify that he knew there were multiple kinds of shotgun shells in the apartment. In sum, there was uncontroverted evidence that defendant did not know what was in the shotgun, and there was nothing to suggest he believed it was birdshot.

Despite the absence of evidence that defendant believed the shotgun was loaded with birdshot, he contends he was nevertheless entitled to present Luczy's testimony.

16

Defendant frames the issue as one of burdens of proof – because malice was an element of the offense, and because two types of ammunition were found in the apartment where defendant obtained the shotgun, the prosecutor had to prove that defendant *did not* believe that the shotgun was loaded with birdshot. Again, defendant is mistaken.

In order to present expert testimony, the proponent of that testimony must show that a sufficient factual basis exists for the predicate facts that make the expert testimony relevant. (See *People v. Gomez* (1999) 72 Cal.App.4th 405, 415–416 [" 'expert testimony on battered woman syndrome is *irrelevant* unless there is a sufficient factual basis for the fact that [the defendant] is a battered woman' "], disapproved on another ground in *People v. Brown* (2004) 33 Cal.4th 892, 908; *People v. Son* (2000) 79 Cal.App.4th 224, 241, fn. omitted [where "there was no evidence that police engaged in tactics wearing down [the defendant] into making false admissions," "the proffered expert testimony on police tactics was irrelevant"]; *People v. Sanchez* (2016) 63 Cal.4th 665, 682–684 [where an expert's opinion assumes case-specific facts that are not true, the opinion is irrelevant].) "Expert testimony *not* based on the evidence will not assist the trier of fact." (*People v. Vang* (2011) 52 Cal.4th 1038, 1046.) " '[A] party cannot [use expert testimony] to place before the jury facts divorced from the actual evidence and for which no evidence is ever introduced.' [Citation.]" (*Ibid.*) In this case, in order to present evidence regarding the characteristics of birdshot or at what distance birdshot may cause injury, defendant was required to provide some factual basis for the position that when he shot the shotgun, he believed it was loaded with birdshot. The prosecutor's burden to prove malice was unrelated to whether defendant's proffered expert testimony had sufficient foundational factual support to establish its relevance.

Although the trial court did not exclude Luczy's testimony on relevance grounds, we will not disturb the trial court's correct ruling. (*People v. Zapien* (1993) 4 Cal.4th 929, 976 [" ' "[A] ruling or decision, itself correct in law, will not be disturbed on appeal

merely because given for a wrong reason.  If right upon any theory of the law applicable to the case, [the trial court's ruling] must be sustained regardless of the considerations which may have moved the trial court to its conclusion" [Citation.]' [Citation.]"].)  Because Luczy's testimony was irrelevant, the trial court did not err in excluding it.[9]

### C.     Harmless Error

The People contend that even if exclusion of Luczy's testimony was error, it was harmless.  We agree.

Erroneous exclusion of evidence is reviewed for harmless error.  (*People v. Prince* (2007) 40 Cal.4th 1179, 1245.)  Defendant acknowledges that ordinarily evidentiary errors are reviewed for prejudice under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).  (*Id.* at p. 836; see *People v. Boyette* (2002) 29 Cal.4th 381, 427–428 [" ' "[a]pplication of the ordinary rules of evidence … does not impermissibly infringe on a defendant's right to present a defense" [Citations.]' "].)  Under the *Watson* standard, we consider whether there is a "reasonable probability that a result more favorable to [defendant] would have occurred absent the error.  [Citation.]" (*People v. Dalton* (2019) 7 Cal.5th 166, 259, citing *Watson*, at p. 837.)  However, defendant contends the exclusion of defense expert

---

[9] We also note that even if defendant had believed the shotgun contained birdshot, Luczy's testimony would have been irrelevant, or only marginally relevant, for two other reasons.  First, there was no evidence that defendant was aware of the characteristics of birdshot, including its potential lethality at various distances, to support the theory that he subjectively believed it would not kill anyone at the distance from which he was shooting.  Second, although Luczy's testimony would have provided the jurors a general concept of birdshot's lethality, it would have only marginally assisted them in evaluating the facts of this case.  Luczy would have testified that birdshot would be fatal at close range, with diminishing lethality out to its nonlethal maximum range of 240 yards, which is *720 feet* – hundreds of feet beyond the 275- to 353-foot distance of the victims in this case.  (See *People v. O'Malley* (2016) 62 Cal.4th 944, 995–996 [trial courts have wide latitude to exclude evidence that is only marginally relevant], citing *Crane v. Kentucky* (1986) 476 U.S. 683, 689–690.)  By contrast, McCombs's testimony that birdshot could be fatal at *300 feet* was relevant to the victims' distance of 275 to 353 feet.

18

testimony supporting a defense, and thus precluding a possible lesser conviction (here, for involuntary manslaughter), undermines the fundamental fairness of a criminal trial and should therefore be evaluated under the higher standard of *Chapman v. California* (1967) 386 U.S. 18.  Under the *Chapman* standard, "before a[n] … error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (*Id.* at p. 24)  We need not determine which standard applies here because, assuming any error took place, it was harmless under either standard.

As noted, the prosecutor was required to prove malice:  that defendant intended to kill or understood the risk to life involved in the action he took and acted consciously disregarding that risk.  (See § 188, subd. (a)(1) & (2); *Butler*, *supra*, 187 Cal.App.4th at p. 1006.)  Defendant proffered Luczy's testimony to prove he did not act with malice because he did not think birdshot would be fatal at the distance from which he fired the shotgun.  To prove malice, the prosecutor asked defendant about whether he understood that his actions were dangerous to human life:

"[PROSECUTOR]:  Do you agree that weapons can kill people?

"[DEFENDANT]:  Yes.

"[PROSECUTOR]:  Do you agree that shotguns in particular, if you fire them at people, that it's dangerous to human life?

"[DEFENDANT]:  Yes.

"[PROSECUTOR]:  Do you agree that when a shotgun is fired at another human being it could kill them?

"[DEFENDANT]:  Um, yes.

"[PROSECUTOR]:  Did you have that same understanding on August 1st when you fired a gun?

"[DEFENDANT]:  Um, yes."

19

Defendant acknowledged that he knew guns are dangerous and firing a shotgun at a person could kill. He simply denied that he fired the shotgun at a person. Therefore, if defendant fired a shotgun at a person – and the jury's verdict indicates it found he did – he did so knowing that his conduct endangered the life of another, fulfilling the requirement of implied malice. (See *People v. Chun*, *supra*, 45 Cal.4th at p. 1181.) Even if Luczy's testimony had been admitted, and the jury had learned that birdshot may not have been fatal at 240 yards, it would not have eroded defendant's admission that he understood firing a shotgun at a person could kill.

Even if exclusion of Luczy's testimony was error, it was harmless beyond a reasonable doubt.

## II. Use of the Nickname "Gangster"

At trial, three witnesses – Erik, Estefania, and the neighbor – identified defendant by his nickname, "Gangster." Each of those witnesses indicated that he or she knew defendant only by the nickname.

Defendant contends that allowing the witnesses to identify him by his nickname was more prejudicial than probative under Evidence Code section 352 and resulted in violation of his due process right to a fair trial. The People maintain that allowing the witnesses to identify defendant by his nickname was relevant to proving his identity as the shooter. We agree with the People.

### A. Additional Background

The prosecutor informed the court that several witnesses would identify defendant by his nickname, "Gangster," because that was the only name they knew him by. Defense counsel sought an in limine ruling precluding witnesses from referring to defendant as "Gangster," arguing it was very prejudicial and not at all probative because there were no gang charges at issue. Defense counsel further argued that referring to defendant as "Gangster" would unfairly impact his credibility. As an alternative to

20

identifying defendant as "Gangster," defense counsel suggested that witnesses could identify him using the clothing he wore in court for the first identification and then refer to him as "defendant."

The trial court ruled that witnesses could identify defendant as "Gangster," but the prosecutor could not refer to "Gangster" as a "moniker." The court explained that the nickname "Gangster" was relevant to the credibility of witness identification of the defendant. The court permitted the prosecutor to ask witnesses if they knew defendant and allow them to explain how they knew him and by what name. The prosecutor was not permitted, for instance, to ask every witness if they knew that defendant's nickname was "Gangster" or to personally refer to defendant as "Gangster."

### B. *Probative Value and Potential for Prejudice*

As we previously noted, "[e]xcept as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.) Relevant evidence includes " 'evidence [that] tends "logically, naturally, and by reasonable inference" to establish material facts such as identity' [Citation.]" (*People v. Bivert* (2011) 52 Cal.4th 96, 116–117) and "evidence relevant to the credibility of a witness" regarding material facts (Evid. Code, § 210).

But even relevant evidence is inadmissible "if its probative value is substantially outweighed by the probability that its admission will … create a substantial danger of undue prejudice …." (Evid. Code, § 352.) Evidence is substantially more prejudicial than probative under Evidence Code section 352 not when it is merely unfavorable or damaging for the defense, but instead when " ' "it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome.' " ' [Citation.]" (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 656; *People v. Duff* (2014) 58 Cal.4th 527, 564 ["damaging" is not synonymous with "prejudicial" under Evid. Code, § 352].)

21

A trial court " 'enjoys broad discretion in determining the relevance of evidence and in assessing whether concerns of undue prejudice … substantially outweigh the probative value of particular evidence.' [Citation.]" (*People v. Sanchez* (2019) 7 Cal.5th 14, 54.) A trial court's decision whether to exclude evidence under Evidence Code section 352 is reviewed for abuse of discretion. (*People v. Doolin* (2009) 45 Cal.4th 390, 437; *People v. Thompson* (2016) 1 Cal.5th 1043, 1114.)

Here, defendant's nickname was probative of both his identity and the credibility of the three witnesses who identified him but knew him only by his nickname. Defendant's not guilty plea to murder, attempted murder, and assault with a deadly weapon placed all of the elements of each offense at issue, including defendant's identity as the shooter. (*People v. Steele* (2002) 27 Cal.4th 1230, 1243.) Furthermore, defendant initially asserted he was not the shooter. In his initial statement to police, he claimed that he was not in the neighborhood where the shooting took place and he denied having had anything to do with the shooting. Erik and Estefania both identified defendant as the shooter and explained that they knew him from the neighborhood, but they knew him only as "Gangster." The neighbor testified that defendant and Joshua entered her home after the shooting and after Joshua hid the shotgun. She said defendant looked "a little bit fidgety." However, she could identify defendant only as "Gangster." The credibility of these witnesses on the issue of defendant's identity would have been diminished if they had claimed to know defendant but could not identify him by some name. (See *People v. McKinnon* (2011) 52 Cal.4th 610, 660 [noting that evidence of identity was very strong where an eyewitness identified defendant using his nickname]; Evid. Code, § 210 [relevant evidence includes "evidence relevant to the credibility of a witness"].)

On the other hand, the use of defendant's nickname had potential for prejudice. The trial court recognized as much. "Gangster" certainly suggested that defendant was a gang member or at least a criminal. (See *People v. Montes* (2014) 58 Cal.4th 809, 859

22

[evidence of gang membership "create[s] a risk that the jury will impermissibly infer that the defendant has a criminal disposition"]; *People v. Young* (2005) 34 Cal.4th 1149, 1224.)

Applying Evidence Code section 352, the trial court considered the probative value of allowing witnesses to use defendant's nickname against the prejudicial impact of the nickname's gang connotation. The court struck a balance – the prosecutor was not permitted to emphasize the nickname, but if witnesses knew defendant only by the nickname, they could identify him using that name. Our Supreme Court has approved of that exact solution. In *People v. Brown* (2003) 31 Cal.4th 518, the defendant sought to exclude any reference to his nickname, "Bam" or "Bam Bam," because it might have a negative connotation associated with weapons. (*Id.* at p. 548.) The trial court in *Brown* directed the prosecutor to avoid using the nickname to the extent possible but allowed witnesses who knew the defendant only by the nickname to identify him using that name. (*Id.* at pp. 548–549.) On review, the Supreme Court concluded the trial court did not abuse its discretion. (*Id.* at p. 548.) The court explained: "The [trial] court carefully weighed defendant's concern over the potentially prejudicial effect of the nickname with the prosecutor's assertion that many of the witnesses knew defendant only by that name. The court then reasonably concluded it would be impossible to sanitize the entire trial of any references to the nickname, but instructed the prosecution to minimize its use in order to reduce any prejudice. [S]ometimes reference to defendant's nickname was necessary to render a witness's testimony understandable, but there was no gratuitous use of, or reference to, the nickname." (*Id.* at p. 551.) The court emphasized that the defendant's identity was at issue and "several witnesses … knew the defendant primarily or exclusively by his nickname." (*Ibid.*)

23

*Brown*'s reasoning is applicable to the facts of this case.  Here, the use of defendant's nickname was relevant to proving defendant's identity as the shooter and supporting witness credibility on that issue, and the trial court properly limited use of the nickname to those witnesses who knew defendant only by that name.  The trial court's evidentiary ruling regarding use of defendant's nickname was not an abuse of discretion and did not render the trial unfair.

## DISPOSITION

The judgment is affirmed.


POOCHIGIAN, Acting P.J.

WE CONCUR:


SMITH, J.


MEEHAN, J.

24